## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MARYLAND

**DAVID TIMBERS**
  *Plaintiff,*
*v.*

**TELLIGENT MASONRY, LLC**
**d/b/a TELLIGENT MASONRY**
**CONSTRUCTION,** *et al.*

  *Defendants.*

Civil Action No.  8:21-cv-00293-JKB

---

## PLAINTIFF'S  OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Plaintiff David Timbers ("Timbers" or "Plaintiff"), by and through his attorneys, James M. Ray, II and Ray Legal Group, LLC, submits this Opposition to the Motion for Summary Judgment filed by Defendant Telligent Masonry, LLC d/b/a Telligent Masonry Construction ("Telligent") and states:

## INTRODUCTION

On February 4, 2021, the Plaintiff filed his initial complaint against Telligent and Tia Taylor ("Ms. Taylor"), an employee of Telligent, seeking damages and/or other legal relief for Telligent's discrimination and retaliation violations under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§  2000e, *et seq.* ("Title VII")*,* and damages and/or other legal relief for Telligent and Ms. Taylor's violations of 42 U.S.C. § 1981 ("Section 1981").  On April 4, 2021, Telligent and Ms. Taylor separately filed motions to dismiss.  *See* ECF Nos. 8 and 9.  On April 13, 2021, the Plaintiff filed an Amended Complaint, which included additional and supplemental factual allegations.  *See* ECF No.  10.  The same five (5) causes of action were alleged by the Plaintiff in both the initial Complaint and Amended Complaint under the following Counts:

Count I:        Title VII – Racial Discrimination Claim Against Telligent

Count II:       Title VII – Retaliation Claim Against Telligent

Count III:      § 1981 – Racial Discrimination Claim Against Telligent

Count IV       § 1981 – Retaliation Claim Against Telligent

Count V        § 1981 – Retaliation Claim Against Ms. Taylor

AC (ECF No. 10).

Telligent and Ms. Taylor moved to dismiss the amended complaint. *See* ECF Nos. 12 and 13. By an order entered on March 23, 2022, this Court denied the motions to dismiss. *See* ECF No. 26.

After the parties engaged in written discovery and the Plaintiff was deposed, the Plaintiff filed a Motion for Leave of Court to file a Second Amended Complaint and Jury Demand (the "Second Amended Complaint") to include additional factual information obtained in discovery and to correct some incorrect dates of events. *See* ECF No. 41. The same discrimination and retaliation claims under Title VII and Section 1981 that the Plaintiff had pled in the original complaint and the amended complaint were reasserted in the Second Amended Complaint; no additional claims or causes of action were included in the Second Amended Complaint. The Motion for Leave of Court has not been ruled upon.

The individual defendant, Ms. Taylor, was dismissed from the litigation after she was deposed. ECF No. 45.

Telligent filed a Motion for Summary Judgment on Count I (Title VII Discrimination), Count II (Title VII Retaliation), Count III (Section 1981 Discrimination) and Count IV (Section 1981 Retaliation). ECF No. 48.[1] As with Telligent's motion to dismiss, the motions for summary

---

[1] The remaining count V was a Section 1981 claim against Ms. Taylor.

judgment must be denied as the Plaintiff can demonstrate a factual and legal basis to his discrimination and retaliation claims against Telligent.

<u>FACTS COMMON TO ALL COUNTS</u>

Mr. Timbers was hired and rehired by Telligent on four (4) separate occasions. *See* Exhibit 1 (Defendant Telligent Masonry LLC's Answers to Plaintiff's Interrogatories ("Telligent ATI") at 7 ("Plaintiff was first hired on January 5, 2017…re-hired for the first time on July 10, 2017… re-hired for the second time on March 20, 2019…rehired for the third and final time on January 24, 2020, and subsequently terminated… September 23, 2020.").

Telligent has no documentation or information about why Mr. Timbers' employment with Telligent terminated prior to the September 23, 2020 termination.   Exhibit 2 (Deposition of Telligent Designated Representative Jason Roberts ("Roberts Dep.") at Page 22, Line 16 to Page 23, Line 5.

Telligent employed Mr. Timbers as a brick mason.  Exhibit 3 (David Timbers Deposition ("Timbers Dep.") at Page 17, Lines 14-19. *See also* Exhibit 3 (Timbers Dep.) at Page 34, Lines 11-16.  ("Q.  What was expected of you, as a brick mason, by Telligent.  A.  Just lay brick for eight hours, or block for eight hours, or whatever it was required during that time on the job. Whatever he would tell me to do, that's what I would do.").

Telligent employee Wilbur Bonilla was Mr. Timbers' supervisor at the Faraday Park East ("Faraday") in Reston, Virginia.  Exhibit 3 (Timbers Dep.) at Page 47 Line 18 to Page 48, Line 2. Work at the Faraday site was temporarily halted on Friday, August 21, 2020.  Exhibit 2 (Roberts Dep.) at Page 31, Line 13 to Page 32, Line 4 ("There was an issue on that site, and it was closed until the issue was resolved.").  Because work was stopped at the Faraday site, several masons, including Mr. Timbers and his brother, Albert Timbers, were told by the Faraday foreman, Wilber

Bonilla, to go to Prince William High School site in Gainesville, Virginia.  Exhibit 2 (Roberts Dep.) at Page 31, Lines 13-22; Exhibit 3 (Timbers Dep.) at Page 67 Lines 4-9 (Q.  Did Wilbur send other people from Faraday Park East to Prince William High School on that day?   A.  Everybody that was working for Wilbur was supposed to report to the high school in Gainesville.) and at Page 68, Lines 3-8 ("Q.  And when he told you and your brother to report to Gainesville, did he say to report there for the day, or for a long-term assignment?  A.  He just said "report there." He didn't say -- that's all he said. That's why we were supposed to go to work that day.")

When the Plaintiff and his brother, who are African-American,[2] arrived at the Gainesville, Virginia site, they were told by supervisor Jose Valladares that Defendant Telligent did not have any work for them at that location.  Exhibit 3 (Timbers Dep.) at Page 59, Lines 3-7 ("Like I said, there was numerous times we were sent to the same place that Jose is a supervisor at the high school. We went there that Friday, and he told us he did not have a place for me and my brother to work.") and at Page 82, Lines 16-18 ("On the 21st, I was denied work because Jose told us there wasn't nothing ready and there was no place for us work.").  However, prior to Mr. Timbers and his brother leaving the Gainesville High School site, a group of fellow Brick Masons, all of whom were Hispanic and employees of Defendant Telligent who had been working at the Faraday site (including Carlos Hernandez-Men, Carlos Menendez, Carlos Molina, Hugo Juarez, Jose Hernandez, and Marlon Ramos) arrived at the Gainesville, Virginia work site and were put to work.  Exhibit 3 (Timbers Dep.) at Page 59, Lines 7-9 ("As we were ready to leave, the rest of our crew showed up, but we worked that day.").

While Mr. Timbers and his brother were refused work by Jose Valladares, Timbers went to another Telligent employee, Jose Penado, who put Mr. Timbers and his brother to work on

---

[2] Exhibit 3 (Timbers Dep.) at Page 43, Lines 16-18.

August 21, 2020.  Exhibit 2 (Timbers Dep.) at Page 82, Line 19 to Page 83, Line 5; Exhibit 4 Jose Valladares Deposition ("Valladares Dep.") at Page 23, Line 4 to Page 24, Line 2.

At the end of the day on August 21, 2020, Defendant Telligent by and through Jose Valladares and Jose Penado told Plaintiff and his brother not to return to the Gainesville, Virginia high school work site and, if they did return, they would not be assigned any work.  Exhibit 3 (Timbers Dep.) at Page 46, Lines 6-8 ("I was told that, if we came back Monday, me and Albert, my brother, wouldn't be allowed to work there anymore.") and at Page 59, Line 9 to Page 60, Line 6.

The Hispanic brick masons were allowed to continue to work at the Prince William high school site from August 24, 2020 through September 11, 2020 while those work opportunities were denied to Plaintiff and his brother (both African American).  See Exhibit 4 (Valladares Dep.) at Page 24, Line 21 to Page 27, Line 6.  See also Exhibit 5.

Moreover, despite being told that masonry construction was being halted on the Faraday project, Plaintiff later learned that construction was not halted and Hispanic Brick Masons were allowed to continue to work at that site from August 20, 2020 – September 11, 2020 while those opportunities were being denied to Plaintiff and his brother (including Hispanic Brick Mason Carlos Molina who worked at the Faraday site from August 27, 2020 until September 11, 2020 and Manuel Bautisa-Lopez who was allowed to continuously work at Faraday from August 20, 2020 until September 11, 2020 when Plaintiff and his brother were denied those opportunities. Exhibit 6; Exhibit 4 (Valladares Dep.) at Page 30, Lines 8-16.

After work on Friday, August 21, 2020, the Plaintiff called Telligent's main office number to speak with someone regarding the lack of work and to report the comments made to him by Jose Luis-Penado/Jose Valladares and received a return call from an individual named "Joe," whom the

Plaintiff later learned was Joe Williams.  Exhibit 3 (Timbers Dep.) at Page 46, Lines 6-8.  Mr. Williams informed Plaintiff during this call that Plaintiff was being refused work because he got into a physical altercation with another employee, which was not true.  Exhibit 3 (Timbers Dep.) at Page 71, Lines 5-10 ("A. Joe told me that I had started fighting with a bricklayer. And I said, What?  If I started a fight with a bricklayer, why am I still working for you all? It wasn't me, it was my nephew. The stories kept changing.").

On Monday, August 24, 2020, the Plaintiff called Mr. Tranquilino Villegas to see where he could report to work.  Exhibit 3 (Timbers Dep.) at Page 69, Line 18 to Page 70, Line 10.  Mr. Villegas and Mr. Timbers talked briefly and Mr. Villegas stated that he would call Mr. Timbers back but Mr. Villegas never called Mr. Timbers back despite Mr. Timbers making several follow-up calls over the next few days.  Exhibit 3 (Timbers Dep.) at Page 73, Line 7 to Page 75, Line 6 and at Page 194, Line 16 to Page 195, Line 16.

Mr. Timbers was not assigned any work for several days after August 21, 2020 at the Gainesville, Virginia site nor was the Plaintiff assigned any work at the Faraday site.  Exhibit 3 (Timbers Dep.) at Page 61, Lines 7-11 ("That means I didn't have no workplace – I didn't have a place to go to work, because the job that Wilbur was on wasn't -- something was wrong. So I wasn't allowed -- the job was shut down, as I was told.").

At some time between September 10 and September 13, 2020, the Plaintiff was informed by the Faraday supervisor Mr. Bonilla that the Plaintiff should return to the Faraday site on September 14, 2020.  Exhibit 3 (Timbers Dep.) at Page 79, Lines 14-19 and Page 195, Line 17 to Page 196, Line 6.   Mr. Timbers worked at the Faraday site on September 14, 2020 and a partial day on September 15, 2020.  Exhibit 3 (Timbers Dep.) at Page 80 Line 11 to Page 81, Line 6. Work was again stopped at the Faraday site due to a structural problem with windows on the site.

Exhibit 3 (Timbers Dep.) at Page 81, Lines 7-11.  On September 15, 2020, Mr. Bonilla called the Plaintiff and told the Plaintiff to report the following day (September 16, 2020) to the Prince William High School site.  Exhibit 3 (Timbers Dep.) at Page 81, Lines 19-21.  The Plaintiff explained to Mr. Bonilla during this telephone call that Jose Valladares already had told Plaintiff that the Plaintiff would be refused work if he returned to the Prince William high school site. Exhibit 3 (Timbers Dep.) at Page 81, Line 19 to Page 82, Line 5 ("I asked him [Bonilla] why did Tranquilino kept sending us to the high school, when he know that Jose was going to deny us to work there; and he said he didn't know.").

The Plaintiff did not travel to the Prince William High School site on September 16, 2020 because he knew that the trip would be a waste of time and Mr. Valladares would not allow the Plaintiff to work at the site.  Ex. 3 (Timbers Dep.) at Page 84, Line 14 ("To the same place that -- yes, I was told to go to the same foreman at the Prince William High School, who I knew was not going to work me. I'm not going to go up there and waste my time to drive all the way up there and come back. It's not worth it.").  Mr. Valledares confirmed that, if Mr. Timbers had returned to the Prince William high school site on August 24, 2020, Mr. Valledares would not have allowed Mr. Timbers to work and even called allowing Mr. Timbers to work on August 21, 2020 a "mistake."  Exhibit 4 (Valladares Dep.) at Page 49, Lines 10-16.

On September 16, 2020, the Plaintiff called Tranquilino Villegas.  Exhibit 3 (Timbers Dep.) at Page 85, Lines 5-10.   During this telephone call, the Plaintiff questioned the decision to send the Plaintiff back to the Prince William High School job site and reminded Mr. Villegas that Jose Valladares was refusing work to the Plaintiff and his brother (black employees) while allowing non-black Hispanic employees to continue to work; Mr. Timbers told Mr. Villegas that Mr.

Timbers intended to file a claim with the EEOC.  Exhibit 3 (Timbers Dep.) at Page 85, Line 11 to Page 86, Line 10.

Mr. Timbers called Jose Valladares on September 18, 2020 and told Mr. Valladares that Mr. Valladares was discriminating against the Plaintiff and his brother by refusing work to black masons but giving work to white and Hispanic brick masons.  Exhibit 3  (Timbers Dep.) at Page 139, Lines 11-20.  Mr. Timbers also threatened to file a charge of discrimination because of this discriminatory conduct at this time.  Exhibit 3  (Timbers Dep.) at Page 139, Line 21 to Page 140, Line 3.  While Mr. Valladares believes that the conversation with Mr. Timbers occurred in person, he admits that the conversation occurred.  Exhibit 4 (Valladares Dep.) at Page 39, Lines 6-21.

Because Plaintiff was not assigned any work by September 22, 2020, Plaintiff called Telligent's main office number to complain about Mr. Valladares refusing work to both Mr. Timbers and his brother (both black employees) but allowing Hispanic workers to continue working, and that Mr. Timbers was going to file discrimination charges.  Exhibit 3 (Timbers Dep.) at Page 90, Line 9 to Page 91, Line 1 and at Page 175, Lines 5-13.  Mr. Timbers was told by the receptionist that the Plaintiff would need to talk someone else at Telligent and would be called the next day. Exhibit 3 (Timbers Dep.) at Page 90, Lines 9-17.  Mr. Timbers, during this September 22, 2020 call, nor at any other time, ever threatened any physical harm directed to Jose Valledares or directed to any Telligent employee.  Exhibit 3 (Timbers Dep) at Page 118, Lines 9-22; Page 135, Line 20 to Page 136, Line 1 and Page 137, Lines 3-11.

Defendant Tia Taylor (HR Specialist for Defendant Telligent) called the Plaintiff during the early morning hours on September 23, 2020.  Exhibit 3 (Timbers Dep.) at Page 91, Line 17 to Page 92, Line 1.[3]   During this conversation, Mr. Timbers again reported his complaint of race

---

[3] Mr. Timbers recalls that the telephone conference occurred during the morning sometime after 7:00 a.m.  Exhibit 3 (Timbers Dep.) at Page 169, Lines 1-2.  Ms. Taylor recalls Mr. Timbers calling her around 7::00 a.m. on the morning

discrimination and lack of work; Mr. Timbers also informed Defendant Tia Taylor during this telephone conversation that he would be filing a charge of race discrimination with the EEOC. Exhibit 3 (Timbers Dep.) at Page 92, Lines 2-8, Lines 16-22; Exhibit AA (Taylor Dep.) at Page 24, Line 20 to Page 21, Line 3 ("He basically called and said Jose was refusing to work him. And then he alluded to the fact that he believes that he's only working the white and Hispanic employees, and he wants to get back to work. And if not, he's going to report it to the labor board."). Ms. Taylor told the Plaintiff that she would open an investigation into the Plaintiff's complaints, but never called Mr. Timbers back.  Exhibit 3 (Timbers Dep.) at Page 93, Lines 2-5.

Defendant Tia Taylor "documented" Plaintiff's complaint of race discrimination, and opened an alleged investigation into his claims of race discrimination.

Defendant Tia Taylor's alleged investigation on September 23, 2020 lasted only a few hours.

The same day, September 23, 2020 at 9:29 a.m., Tia Taylor forwarded an "employee investigation report" to Mr. Villegas, Michael Pappas, Mr. Valladares, Petra G. Botha and Chris M. Pappas with the request "[i]f you have any other recommendations to eradicate this issue other than the one I provided, please let me know." Exhibit 8.  Mr. Valladares responded a few minutes later, stating "10-4.  Please send to all the fore man not hire he's [his] family timber because all of them are troublemaker[.]  Been in jail for a long time[.]  That's why they are like that bad Attitude." Exhibit 9.   Mr. Pappas then promptly at 9:35 a.m. emailed Ms. Taylor and Tranquilino Villegas and instructed them to terminate Mr. Timbers' employment with Telligent.  Exhibit 10.

Following her telephone conversation with Plaintiff on September 23, 2020, Defendant Tia Taylor drafted an Employee Disciplinary/Termination Form which contained false allegations of poor work performance by Plaintiff.  Defendant Telligent, by and through their agents, servants,

---

of September 23, 2020.  Exhibit 7  (Tia Taylor Deposition ("Tia Taylor Dep.")) at Page 23, Lines 9-13; Page 24, Lines 9-13.

and employees Michael Pappas, Tranquilino Villegas, and Jose Valladares instructed Ms. Taylor to terminate Plaintiff's employment on September 23, 2020 at 9:35 a.m. (just a few hours after the Plaintiff made yet another complaint of race discrimination).  Exhibit 11.

The Employee Disciplinary/Termination Form that was drafted on September 23, 2020 falsely alleged that the Plaintiff had previously made verbal threats against another employee (at some undisclosed time in the past) and otherwise demonstrated "poor work performance" during the course of his employment with Defendant Telligent.

In addition, Defendant Tia Taylor, acting as an agent, servant, and employee of Defendant Telligent, and after having decided to terminate, and/or to recommend terminating the Plaintiff's employment, drafted a Termination Notice on September 23, 2020 that was mailed to the Plaintiff, which was not received by Plaintiff until several days later.  Exhibit 12.

The Termination Notice falsely alleged that Plaintiff was being terminated "due to [his] conduct over the past several months…."  Exhibit 12.

Plaintiff was never disciplined or otherwise informed by Defendants during his employment that there were any issues with his work performance at any time prior to his termination.

The first time Mr. Timbers learned that he was being accused of poor work performance and, (ii) that he was being accused of engaging in inappropriate conduct, was not until the end of September 2020, when he received his termination paperwork in the mail—immediately after he internally complained of race discrimination and indicated that he would be filing a charge of discrimination with the EEOC to Defendants on September 23, 2020.  Exhibit 3 (Timbers Dep.) at Page 178, Line 17 to Page 179, Line 3 and Page 181, Lines 3-12.; Exhibit 3 (Timbers Dep.) at Page 137, Lines 14-15.

SUMMARY JUDGMENT STANDARD

This Court recently reiterated the standards applicable to a motion for summary judgment.

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970). If a party carries this burden, then the court will award summary judgment unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented, and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id*. at 252. To carry these respective burdens, each party must support its assertions by citing specific evidence from the record. Fed. R. Civ. P. 56(c)(1)(A). The court will assess the merits of a summary judgment motion, and any responses, by viewing all facts and making reasonable inferences in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007); see also Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008)."

*Crosby v. United Parcel Serv., Inc*., No. CV JKB-20-3157, 2022 WL 2344102, at *2 (D. Md. June 29, 2022).[4]

"Granting summary judgment motions in employment discrimination disputes is 'particularly disfavored,' *Lowman v. Maryland Aviation Admin.*, Civ. No. JKB-18-1146, 2019 WL 133267, at *9 (D. Md. Jan. 8, 2019), and 'courts must take special care ... because motive is often the critical issue,' *Wommack v. Ceres Terminals, Inc.*, No. CV JKB-19-1720, 2019 WL 4393136, at *5 (D. Md. Sept. 13, 2019) (*quoting Evans v. Techs. Applications & Serv. Co*., 80 F.3d 954, 958

---

[4] "Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit." *Dawson v. Hous. Auth. of Baltimore City*, No. CV JKB-18-1442, 2019 WL 161497, at *1 (D. Md. Jan. 10, 2019) (*citing* Fed. R. Civ. P. 56(c)(4)). Telligent includes a Declaration from Jason Roberts, who was the corporate designee of Telligent. *See* Exhibit F to Telligent's Appendix of Exhibits. Telligent cannot rely on any statements made by Mr. Roberts in his Declaration as he concedes that his Declaration is "based on my personal knowledge, information that I have learned, and matters known to Telligent as a whole." *See* Telligent Exhibit F at ¶ 1. Many of Mr. Roberts' statement are qualified by "I have learned…" Such statements are not based on personal knowledge and cannot support Telligent's motions for summary judgment.

(4th Cir. 1996)).  ""[E]ven in the employment discrimination context, granting a summary judgment motion 'remains appropriate if the plaintiff cannot prevail as a matter of law.'" *Wommack*, 2019 WL 4393136, at *5 (*quoting Evans*, 80 F.3d at 958–59).

TITLE VII DISCRIMINATION

"[A] plaintiff asserting discriminatory treatment under Title VII may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019). "To establish a discriminatory termination claim, a plaintiff must make a *prima facie* showing that: (1) he was a member of a protected class; (2) he was satisfactorily performing his job at the time of the termination; (3) he was terminated from his employment; and (4) the prohibited conduct in which he engaged was comparable in seriousness to misconduct of other employees outside the protected class who received less severe discipline." *Id.* (*citing Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011). If an employee meets his burden to establish a prima facie case, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse employment action." *Hayes*, 922 F.2d at 223 (*citing Holle*, 650 F.2d at 336. "If the employer meets this burden of production, the employee must then demonstrate that the defendant's proffered reason is pretextual." *Hayes*, 922 F.2d. The same analysis applies to both Mr. Timbers' Title VII and Section 1981 claims. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 272 (4th Cir. 2015) (*citing Honor v. Boaz-Allen & Hamilton, Inc.*, 383 F.3d 180, 188 (4th Cir. 2004)).

THE PLAINTIFF HAS ESTABLISHED A *PRIMA FACIE* CLAIM OF DISCRIMINATION

Telligent contends that Mr. Timbers fails to establish a *prima facie* claim because he cannot meet the requirement that he was satisfactorily performing his job at the time of the termination.

*See* Telligent Memorandum at 16.  "Such a showing of satisfactory performance does not require the plaintiff to show that he was a perfect or model employee.  Rather, a plaintiff must show only that he was qualified for the job and that he was meeting his employer's legitimate expectations. *Haynes*, 922 F.3d at 225 (noting that general disputes of material facts existed as to whether an African American employee was performing his job satisfactorily at the time of this termination") (*citing Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 515–16 (4th Cir. 2006)).  Notably, however, the Fourth Circuit has held that "although we have held that we must focus on the employer's perception in the context of the pretext stage, we have not so held with respect to a plaintiff's prima facie case." *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 650 (4th Cir. 2021).

Substantial factual disputes exists on the issue of whether Mr. Timbers was meeting Telligent's reasonable expectations.

Mr. Timbers was rehired by Telligent several times, most recently in January 2020.  Exhibit 1 (Telligent ATI) at 7.  He was given a raise from $24/hour to $26/hour in February 2020.  *See* Exhibit 13 (Telligent Employment Record).  Even though Mr. Timbers had just returned to Telligent in January 2020, he stopped working for Telligent for an extended period of time between early March 2020 and late June 2020 but was allowed to return to work at Telligent and even retained his $26/hour rate of pay.  *See* Exhibit 13 (Telligent Employment Record).[5]  Mr. Timbers continued to work under Wilbur Bonilla at the Faraday site in June, July, August and September 2020.  Exhibit 13 (Telligent Employment Record).

Mr. Timbers was never disciplined or otherwise informed by Defendants during the course of his employment that there were any issues with his work performance at any time prior to his

---

[5] Telligent documented this period as "Non-Documented Leave of Absence – Not Terminated."  Exhibit 13 (Telligent Employment Record).  It is not unusual for masons to leave Telligent, work for another masonry company, and then return to work at Telligent when the job at the other masonry company is over.  Exhibit DD (Tranquillo Villegas Deposition ("Villegas Dep.")) at Page 33, Lines 9-21.

termination. Exhibit 2 (Roberts Dep.) at Page 20, Lines 12-16 (no prior disciplinary write-ups; . Exhibit 3 (Timbers Dep.) at Page 178, Line 17 to Page 179, Line 3 and Page 181, Lines 3-12 (Timbers first learned of any complaints about his work performance after he received the September 23, 2020 termination letter). *See also* Exhibit 14 (Villegas Dep.) at Page 50, Line 22 to Page 52, Line 16 (Complaints about an employee whose work constantly needed to be torn down and rebuilt would have been reported to the superintendents, who would have reported that to General Superintendent Villegas never received any complaint about Timbers prior to Timber's termination).

While Telligent makes broad statements about Mr. Timbers' work performance, Telligent only directs the Court to deposition testimony from the discriminator, Jose Valladares, and from Nieshia Williams.

While Telligent claims that Mr. Valladares told Mr. Timbers "nearly every day" that Mr. Timbers work was unacceptable (Telligent Memorandum at 17), that claim is disputed by Mr. Timbers and creates a factual dispute. Indeed, Telligent even acknowledges several other factual disputes, including that "Plaintiff denies that the work was torn done." *Id.*

Mr. Valladares admitted that he never documented Mr. Timbers' supposed unsatisfactory work performance even though, according to him "[e]very time [Timbers would] do something, he has to redone it, because it was not too good." Exhibit 4 (Valladares Dep.) at Page 15, Lines 19-21; Page 18, Lines 11-16.

While Ms. Williams complained about Mr. Timbers, she never talked with Mr. Timbers about the neatness of his work or gave him any verbal warning or formal write up about timeliness. Exhibit 15 (Nieshia Williams Deposition (Williams Dep.) at Page 17, Lines 8-21. Ms. Williams

did not talk with Mr. Timbers, and she is unaware of anyone else talking with Mr. Timbers' the quality of his work.  Exhibit 15 (Williams Dep.) at Page 25, Lines 7-16.

Ms. Williams also contradicted herself during her deposition.  While Telligent points to a statement from Ms. Williams' deposition that Mr. Timbers' work needed to be torn down and redone (see Telligent Memorandum at 18), Ms. Williams actually was only aware of a single instance in which she claimed that Mr. Timbers' work did not meet standards.  Exhibit 15 (Williams Dep.) at Page 57, Line 20 to Page 58, Line 4.  Ms. Williams took photographs of that supposed substandard work  Exhibit 15 (Williams Dep.) at Page 19, Lines 3-12.[6]  Mr. Timbers' work, however, did not need to be torn down, but only required some extra mortar on the concrete block needed to be chiseled off.  Exhibit 15 (Williams Dep.) at Page 60, Lines 9-19; Page 62, Line 20 to Page 63, Line 2.  Even though Ms. Williams took numerous photographs of the concrete block work under her supervision, this was the only substandard work documented by Ms. Williams.  Exhibit 15 (Williams Dep.) at Page 19, Lines 18-19; Page 63, Lines 13-16 ("Q Presumably if you had more photographs of bad work by him you would have documented it, correct?  A Yes.").  These photographs were not sent to anyone else at Telligent until Ms. Taylor requested the photographs in February 2021.  Exhibit 15 (Williams Dep.) at Page 40, Lines 13-19; Page 45. Lines 8-19.

In any event, the testimony of Mr. Valladares and Ms. Williams is not relevant because the issue is whether Mr. Timbers "was satisfactorily performing his job at the time of the termination." *Haynes*, 922 F.3d at 223 (emphasis added).  Mr. Valladares last supervised Mr. Timbers in July 2019 at the Prince William high school site.  Exhibit 4 (Valladares Dep.) at Page 14, Lines 10-19.

---

[6]  The photographs taken by Ms. Williams can be found at the end of Telligent Appendix of Exhibit H.

Ms. Williams only supervised Mr. Timbers for a few months in mid-2019.  Exhibit BB (Williams Dep.) at Page 15, Lines 9-14.  Their testimony is incompetent on the issue of whether Mr. Timbers was meeting standards.  In June, July, August and September 2020.  Mr. Timbers continued to work under Wilbur Bonilla at the Faraday site in June, July, August and September 2020. *See* Exhibit 13 (Telligent Employment Record), and Telligent has provided no evidence about any supposed inadequacy of Mr. Timbers' work performance during this relevant time period.  Indeed, Wilburn Bonilla reached out and called Mr. Timbers to return to work at the Faraday site on September 14 and 15, 2020.  Exhibit 3 (Timbers Dep.) at Page 79, Lines 14-19 and Page 195, Line 17 to Page 195, Line 17 to Page 196, Line 6.

Telligent posits other arguments in support its claim that Mr. Timbers' performance was not adequate, referencing Mr. Timbers would "miss work, be late, and would not provide notice" and was "insubordinate." Telligent Memorandum at 18-19.  Mr. Timbers was never disciplined for any of these acts.   Exhibit 2 (Roberts Dep.) at Page 20, Lines 12-16 (no prior disciplinary write-ups; . Exhibit 3 (Timbers Dep.) at Page 178, Line 17 to Page 179, Line 3 and Page 181, Lines 3-12 *See also* Exhibit 15 (Williams Dep.) at 17 Lines 8-21 (Ms. Williams never gave Mr. Timbers any verbal warning or formal write up about timeliness.).  As noted previously, Mr. Timbers was allowed to return to work at the Faraday site even after an absence of over three (3) months in 2020 and it was not unusual for masons to leave Telligent, work for another masonry company, and then return to work at Telligent when the job at the other masonry company is over.  Exhibit 14 (Villegas Deposition) at Page 33, Lines 9-21.  Even if a mason's attendance was inconsistent, the mason would still be allowed to work for Telligent when the mason eventually showed up.  Exhibit 14 (Villegas Dep.) at Page 41. Line 22 to Page 42, Line 4.  These claims are insufficient to defeat Mr. Timbers' *prima facie* case on the issue of whether he was meeting Telligent's

reasonable expectations in light of the lack discipline relating to Mr. Timbers' undocumented attendance and timeliness and Telligent's admitted tolerance for inconsistent attendance and timeliness among its masons.  *See Warch*, 435 F.3d at 517, 2006 ("[N]othing prohibits the employee from countering this assertion with evidence that demonstrates (or at least creates a question of fact) that the proffered "expectation" is not, in fact, legitimate at all.").[7]

Telligent's final effort to attempt to defeat Mr. Timbers' *prima facie* case is to argue that "Plaintiff most recently failed to meet the expectation of Telligent when he called Telligent's headquarters and threatened violence against a supervisor."  Telligent Memorandum at 19.  This claim, however, is factually disputed as Mr. Timbers testified that he did say during his September 22, 2020 call to Telligent that he would assault Mr. Valladares or any other person at Telligent. Exhibit 3 (Timbers Dep.) at Page 91, Lines 12-13; *see also* Exhibit 3 (Timbers Dep.) at Page 118, Lines 9-22; Page 135, Line 20 to Page 136, Line 1 and Page 137, Lines 3-11.  Mr. Timbers' denial of any such threat must be viewed in a light favorable to Mr. Timbers, the non-moving party, and precludes granting summary judgment on the issue of whether Mr. Timbers was meeting Telligent's reasonable expectations.

<u>THE PLAINTIFF HAS ESTABLISHED PRETEXT</u>

"After the plaintiff establishes a prima facie case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the termination."  *Warch*,  435 F.3d at 513–14 (4th Cir. 2006).  "'If the employer meets this burden, 'the presumption of discrimination created by the prima facie case disappears from the case' and the plaintiff must prove that the 'proffered

---

[7]  As to Telligent's claim that "Plaintiff was insubordinate and he frequently -sometime in coordination with other family members – would get involved in verbal or physical altercations on worksites of Telligent."  Telligent Memorandum at 19.  Telligent tortuously attempts to extract support for this statement from four lines from discriminator Valladares' deposition testimony that Mr. Timbers was involved in an altercation between Mr. Timbers nephew and another mason "because they was talking together."  Exhibit 4 (Valladares Dep.) at Page 45, Lines 10-13.  Mr. Timbers denies that he had any involvement in the altercation other than telling his nephew "No," and causing his nephew to stop.  Exhibit 3 (Timbers Dep.) at Page 186, Line 16 to Page 187, Line 8.

justification is pretextual.'" *Id.*, 435 F.3d at 514.   However, "A plaintiff meets the burden of demonstrating pretext by showing that the employer's proffered explanation is 'unworthy of credence or by offering circumstantial evidence sufficiently probative of the issue of retaliation.'" *Tsige v. Marriott Hotel Services, Inc.*, No. GJH-18-2341, 2019 WL 2904665, at *3 (D. Md. July 5, 2019) (*quoting Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004).

As the Fourth Circuit of Appeals recently explained:

> If a plaintiff can demonstrate "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination [or retaliation]," summary judgment is not appropriate. Burgess, 466 F. App'x [272] at 277 [(4th Cir. 2012)] (*quoting Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).   Further, the Supreme Court has held that "a plaintiff's prima facie case of discrimination, combined with evidence from which a jury could conclude that an employer's proffered justification was false, support[s] an inference of discrimination sufficient to defeat summary judgment." *Burgess*, 466 F. App'x at 277 (*citing Reeves v. Sanderson Plumbing Prod., Inc*., 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

*Smith v. CSRA*, 12 F.4th 396, 421 (4th Cir. 2021).   "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination"  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S. Ct. 2742, 2749, 125 L. Ed. 2d 407 (1993).  *See Reeves*, 530 U.S. at 147, 120 S. Ct. at 2108 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").

Telligent contends that Mr. Timbers cannot establish pretext because Mr. Valladares claims that he did not provide work because of Mr. Timbers' "poor-quality masonry."   Telligent Memorandum at 23.  Mr. Valladares' *post-hoc* explanation, however, supports a claim of pretext. Mr. Valledares never documented any supposed issues with Mr. Timbers' work and continued to

have Mr. Timbers work at the Gainesville high school site in 2019.  According to Mr. Timbers, Mr. Valledares never mentioned anything to Mr. Timbers about the quality of his work.

      Only a small number of African Americans worked for Telligent.  *See* Exhibit 3 (Timbers Dep.) at Page 64, Lines 5-7 (Mr. Timbers stating, "I never seen a black bricklayer, except for me and my brother, on any site I went to."); Exhibit 4 (Valledares Dep.) at Page 20, Line 15 to Page 12 (In 2020 only four to five African Americans were working at the Gainesville high school site, the Timbers family and two other men from Baltimore who no longer work for Telligent).[8]  Despite the small number of African Americans working at Telligent, Mr. Valledares apparently has issues with the entire Timbers family, Exhibit 4 (Valladares Dep.) at Page 42, Lines 8-19 ("All his whole family"), while all of the Hispanic masons "do quality work." Exhibit 4 (Valladares Dep.) at Page 24, Lines 3-5.

      Mr. Valladares even went as far as to send an email to numerous other Telligent officials on September 23, 2020 when advised that Telligent intended to terminate Mr. Timbers:

> 10-4.  Please send to all the fore man not hire he's [his] family timber because all of them are troublemaker[.]  Been in jail for a long time[.]  That's why they are like that bad Attitude.

Exhibit 9 (Valladares September 23, 2020 email).  A jury could easily read this broad condemnation of the entire Timbers family by Mr. Valladares is based on the family's race: the entire family are troublemakers, have been in jail and have bad attitudes.[9]  A jury could interpret "That's why they are like that" as nothing more than "That's why those people [African

---

[8]  A "large number" of masons worked at the Prince William high school site.  Exhibit 2 (Roberts Dep.) at Page 31, Lines 7-12.

[9]  In addition, when Mr. Timbers' nephew was involved in an altercation with a white Telligent employee, the nephew was fired, but the while employee was not fired.  See Exhibit 3 (Timbers Dep.) at Page 155, Lines 2-9.  ("Like I said, on any job site, they fire both people, because that's the way it's done. So I felt discriminated against, because they didn't fire the other guy, and they fired the black person, who was my nephew.").

Americans] are like that."  Under all this circumstances, a jury could find racial animus rooted in Mr. Valladares' actions and statements rendering his explanation that he did not provide work to Mr. Timbers, while employing all of the Hispanic mason, as a pretext.[10]

Because Mr. Timbers was not assigned any work by September 22, 2020, Plaintiff called Telligent's main office number to complain about Mr. Valladares refusing work to both he and his brother (both black employees) but allowing Hispanic workers to continue working, and that he was going to file discrimination charges.  Exhibit 3 (Timbers Dep.) at Page 90, Line 9 to Page 91, Line 1 and at Page 175, Lines 5-13.  Telligent contends that Mr. Timbers threatened Mr. Valledares during that September 22, 2020 call.  Telligent Memorandum at 25.  Mr. Timbers denies that he threatened Mr. Valladares during the September 22, 2020 call and further states that he did not at any time threaten any physical harm directed to Jose Valledares or directed to any Telligent employee.  Exhibit 3 (Timbers Dep.) at Page 118, Lines 9-22; Page 135, Line 20 to Page 136, Line 1 and Page 137, Lines 3-11.  This is a factual dispute that, for purposes of summary judgment, is resolved by finding that no threats were made on September 22, 2020, making any termination based on a non-existent threats a pretext.  *Haynes*, 922 F.3d at 225 ("In order to show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or <u>based on mistakes of fact</u>. Once the plaintiff offers such circumstantial evidence, the case must be decided by a trier of fact and cannot be resolved on summary judgment.") (emphasis added; citations omitted).

Ms. Taylor confirmed that Mr. Timbers and she talked in the morning on December 23, 2020.  Exhibit 7 (Taylor Dep.) at Page 24, Line 4 to Page 25, Line 9.  Mr. Timbers again raised

---

[10]  Mr. Timbers had been working at the Faraday site under Wilbur Bonilla without incident in 2020.   When Mr. Timbers was sent to the Prince William high school site on August 21, 2020 that was the first time since 2019 that Mr. Valladares could discriminate against Mr. Timbers.

his claim of racial discrimination, that Mr. Valladares was only working white and Hispanic employees.  Exhibit 7 (Taylor Dep.) at Page 24, Line 4 to Page 25, Line 3.  Ms. Taylor conceded that Mr. Timbers was referencing a "race issue."  Exhibit 7 (Taylor Dep.) at Page 25, Lines 4-6.  Mr. Timbers did not make any threats during his call with Ms. Taylor on December 23, 2020.  Exhibit 7 (Taylor Dep.) at Page 25, Lines 7-9.

Ms. Taylor called Mr. Valladares after talking with Mr. Timbers and described Mr. Valladares as "frantic."  Exhibit 7 (Taylor Dep.) at Page 28, Lines 4-18.  Mr. Valladares admitted that he refused to allow Mr. Timbers to work.  Exhibit 7 (Taylor Dep.) at Page 28, Lines 19-21, and stated that the entire Timbers family were "horrible workers."  Exhibit 7 (Taylor Dep.) at Page 29, Lines 12-17.

After talking to Mr. Valladares, Ms. Taylor made no further effort to investigate Mr. Timbers' race discrimination complaint.  Exhibit 7 (Taylor Dep.) at Page 63, Lines 3-9.  Instead, following leads provided to her by Mr. Valladares.  Ms. Taylor looked for reasons to be able to terminate Mr. Timber's employment.  See Exhibit 7 at Page 29, Lines 6-11 (Q.  But when you talked to Mr. Valladares you were speaking just about David Timbers?  A I don't recall if other people became -- he spoke about other people, I can't recall. I know he pointed at me in the direction of Nieshia [Williams] and David [Arnold], I know that much.").  According to the information in the Employee Complaint Form, Mr. Arnold, who is not a Telligent employee, stated that Mr. Timber and his brother would cause fights, that Mr. Timbers once was sleeping at a site because the cops were looking for him.  These statements are curious given that Mr. Valladares who was Mr. Timbers supervisor at the Prince Williams high school site only mentioned the single altercation by Mr. Timbers' nephew and no one at Telligent ever claims that Mr. Timbers was involved in any fights; Mr. Timbers also refutes these claims. Exhibit 14 (Villegas Dep.) at Page

Case 8:21-cv-00293-JKB   Document 49   Filed 09/20/22   Page 22 of 28

54, Line 3 to Page 55, Line 9 (Mr. Arnold was the builder superintendent at the Prince William site; none of these events were ever reported to Telligent); Exhibit 3 (Timbers Dep.) at Page 71, Lines 5-9 (fighting) and at Page 108, Lines 19-21 (sleeping).  Moreover, Telligent employees who are involved in fights are not fired.  Exhibit 14 (Villegas Dep.) at Page 21, Line 18 to Page 22, Line 5.  Telligent cannot legitimacy terminate Mr. Timber's employment based statements from another non-Telligent employee that are entirely inconsistent with Telligent's knowledge and inconsistent with its typical practices.  Similarly, Ms. Williams only stated that a couple came to a site looking for Mr. Timbers, see Exhibit 8, an evet that Telligent can claim would justify an employee's termination.

It is clear that Ms. Taylor investigation was designed to manufacture some basis to terminate Mr. Timbers' employment after he made complaints of racial discrimination.   She investigated the complainant, not the complaint.   Under these circumstances and given the substantial factual disputes present, Telligent is not entitled to summary judgment as Mr. Timbers has established pretext.

<u>THE PLAINTIFF HAS ESTABLISHED A CLAIM OF RETALIATION</u>

To establish a prima facie retaliation claim under Title VII or § 1981, a plaintiff must show that (i) that he engaged in protected activity, (ii) that his employer took adverse action against him and (iii) that a causal relationship existed between the protected activity and the adverse action. *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 327, 2018 WL 3321317 (4th Cir. 2018); *Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 217 (4th Cir. 2016).[11]

---

[11]   A discrimination claim under Title VII and § 1981 differs from a retaliation claim under those laws.  In a discrimination claim, the plaintiff must establish an "adverse employment action" while a retaliation claim requires an adverse action "because the adverse action need not be employment or workplace-related in order to sustain a retaliation claim." *Strothers*, 895 F.3d at 327 n3.

22

A protected activity may fall into two categories, opposition and participation. *Arsenault v. Dep't of Pub. Safety & Corr. Services*, CV RDB-20-0998, 2020 WL 7694472, at *5 (D. Md. Dec. 28, 2020) (citing 42 U.S.C. § 2000e-3(a)). The participation clause protects an employee from retaliation where he "has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing" under Title VII. *Id.* (*citing* 42 U.S.C. § 2000e-3(a)) . "As for the opposition clause, the Fourth Circuit has held that 'protected oppositional activities may include "staging informal protests and voicing one's own opinions in order to bring attention to an employer's discriminatory activities," as well as "complaints ... about suspected violations."' *Id.* (*quoting EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005) (*quoting in turn Bryant v. Aiken Reg'l Med. Ctrs*., 333 F.3d 536, 543-55 (4th Cir. 2003)). "If an employee has a reasonable belief that a Title VII violation 'is in progress,' an internal complaint is protected activity, even if a claim based on the underlying conduct would be unlikely to succeed." *Jones v. United Health Group*, CV JKB-17-3500, 2019 WL 1903668, at *12 (D. Md. Apr. 29, 2019) (*quoting Boyer-Liberto v. Fontainebleau Corp*., 786 F.3d 264, 282 (4th Cir. 2015), *aff'd sub nom*. *Jones v. UnitedHealth Group, Inc.*, 802 Fed. Appx. 780, 2020 WL 2116496 (4th Cir. 2020)

Telligent makes two nonsensical attacks on Mr. Timbers' prima face retaliation case. First, Telligent contends that Mr. Timbers did not have an objectively reasonable belief of discrimination. This contention was rejected at the motion to dismiss level (*see* ECF No. 25 at 11) and similarly must be rejected at the motion for summary judgment level. An African American being denied work (along with his African American brother also being denied work) while Hispanic employees are allowed to work constitutes an objectively reasonable belief of discrimination. Second, Mr. Timbers complained of racial discrimination on four (4) separate occasions prior to his termination: September 16, 2020 (Mr. Villegas), September 18, 2020 (Mr.

Valladares), September 22, 2020 (Telligent office) and September 23, 2020 (Ms. Taylor).   Mr.
Timbers' complaints were noted in the Employee Complaint Form completed before Mr. Timbers
was terminated.   Exhibit EE (Mr. David Timbers called stating that he and his brother Albert
Timbers have been discriminated against by foreman Jose v.   The stated that Jose refuses to work
him and his brother because they are African American.   He states that Jose only gives the work
to the white and Hispanic employees. David stated he would be reporting the company to the labor
board.").   This complaint was broadly distributed within Telligent, including to Michael Pappas,
Mr. Villegas, and Mr. Valladares, before Mr. Timbers was terminated.   See Exhibit GG
(September 23, 2020 Tia Taylor email).   As this Court noted in the memorandum denying
Telligent's motion to dismiss, "[t]his temporal proximity of only a few days is clearly sufficient to
support a reasonable inference of causation. ECF No. 25 at 12 (*citing and quoting Foster v. Univ.
of Md E. Shore*, 787 F.3d 243,253 (4th Cir. 2015)).   The Plaintiff, therefore, has established a
*prima facie* of discrimination.

Finally, for the same reasons that Mr. Timbers has established pretext as to discrimination
claim, he has also established pretext for the retaliation claim.   A factual dispute exists as to
whether Mr. Timbers made any threats and Mr. Timbers' termination cannot be based on a
factually disputed justification.

### THE PLAINTIFF HAS ESTABLISHED EMOTIONAL DISTRESS DAMAGES

Telligent argues that Mr. Timbers does not have any basis for emotional distress damages.
Telligent Memorandum at 34.   However Mr. Timbers described being in a "down mode" because
of the discrimination suffered at Telligent:

> A Well, I mean, when you're discriminated against, you know, you just -- things
> are, like, off course, and you're not thinking your normal thoughts. You're thinking
> about more than one thing, and how you're going to survive.

Exhibit 3 (Timbers Dep.) at Page 161 Line 22 to Page 162 Line 4.  Page 162, Lined 10-11 ("I

didn't due much.  I laid in bed mostly all day."); Page 193, Lines 4-11 ("I just didn't feel like doing

nothing, because I was thinking about what I was going to do with my life, and how was I going

to get it back on track. And then, you know, like I said, I kept reading and believing, God put the

answer in my head to -- you've got to file.  You've got to do something about it. So this is what

I've done.").  Feeling like he had been "spit in the face," (Exhibit 3 (Timbers Dep.) at Page 110,

Lines 14-22), Mr. Timbers later elaborated:

> Q Mr. Timbers, earlier in your testimony, when you were describing the
> emotional distress that you were feeling, you said, "Nobody wants
> me."
> Can you let us know what you meant when
> you said "nobody wants" you?
>
> A I mean, you know, when you're going through something like that, you feel
> everybody is against you, the whole world. I felt like the world was against me at
> that moment, and just took a lot out of me.
>
> Q When you say -- when you describe the moment, are you describing the
> incidents of where you were denied work on the 21st of August?
>
> A Yes.

189- 7-14.

"[A] plaintiff's testimony, standing alone, can support an award of compensatory damages

for emotional distress."  *Bryant v. Aiken Reg'l Med. Centers Inc*., 333 F.3d 536, 546 (4th Cir.

2003).  Factors in evaluating an emotions distress claim "include the factual context in which the

emotional distress arose; evidence corroborating the testimony of the plaintiff; the nexus between

the conduct of the defendant and the emotional distress; the degree of such mental distress;

mitigating circumstances, if any; physical injuries suffered due to the emotional distress; medical

attention resulting from the emotional duress; psychiatric or psychological treatment; and the loss

of income, if any." *Sloane v. Equifax Info. Services, LLC*, 510 F.3d 495, 503 (4th Cir. 2007).  Here

the factual circumstances are egregious as Mr. Timbers was the subject of racial discrimination that precluded him from being able to work (when only work at the Prince William high school site was available) and lead to the termination of his employment and source of income.

Evaluation of Mr. Timbers emotional distress claim is also inappropriate at this summary judgment stage:

> The authorities upon which defendants rely were cases analyzing the sufficiency of trial testimony to support awards of compensatory damages for emotional distress resulting from constitutional violations. The cases do not support truncation of that issue at the summary judgment stage. *In Price v. City of Charlotte, North Carolina*, 93 F.3d 1241 (4th Cir.1996), the Court endorsed the consideration of a variety of factors in the analysis of such a claim, including loss of esteem among one's peers, physical injury, need for counseling, loss of income, the context of the events surrounding the distress, corroborating evidence and forced change in conduct. The Court notes this to be a particularly fact-intensive inquiry, the type of which is ill-suited to disposition by summary judgment. Moreover, damages for intangible harms are subjective and depend, in part, on the demeanor of the witness. *See, Pathways Psychosocial v. Town of Leonardtown, MD*, 223 F.Supp.2d 699 (D.Md.2002).

*Maryland State Conference of NAACP Branches v. Maryland State Police*, 454 F. Supp. 2d 339, 346, 2006 WL 2827509 (D. Md. 2006).   Even if Mr. Timbers were only entitled to nominal damages, attorney's fees and expenses can be awarded.   *Brooks v. Maryland*, No. CV WDQ-07-3224, 2009 WL 10682096, at *6 (D. Md. Apr. 14, 2009).

Telligent's motion for summary judgment on the issue of Mr. Timbers' emotional distress claim damages musts be denied at this time.[12]

## **CONCLUSION**

For the reasons set forth herein, Telligent's' motion for summary judgment must be denied.

---

[12]  Telligent also seeks summary judgment on the issue of punitive damages.  The actions of Telligent as demonstrated in this Opposition are sufficient to constitute the required recklessness to establish the Plaintiff's entitlement to punitive damages.

Respectfully Submitted,

**RAY LEGAL GROUP, LLC**

By: ___/s/ James M. Ray_____
James M. Ray, II (#012773)
jim.ray@raylegalgroup.com
8720 Georgia Avenue, Suite 904
Silver Spring, Maryland 20910
Phone: (301) 755-5656
Fax:    (301) 755-5627

*Attorneys For Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 20th day of September 2022, a copy of the foregoing Plaintiff's Opposition to Motion for Summary Judgment was served electronically through the Court's CM/ECF system on:

Brandon N. Mourges, Esq.
Crepeau Mourges
1344 Ashton Road, Suite 110
Hanover, MD 21076
brandon@usataxlaw.com

*Counsel for Defendant Telligent Masonry, LLC*

                                        /s/ James M. Ray, II
                                        James M. Ray, II (#012773)