# EXHIBIT 15



# Transcript of Nieshia Williams

**Date:** July 28, 2022
**Case:** Timbers -v- Telligent Masonry, LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

17

1 be -- did any of his work have to be torn down and
2 redone?
3    A  Yes.
4    Q  Who did the tearing down and the redoing
5 of it?
6    A  It was other masons. I don't recall their
7 specific names.
8    Q  Did you have any conversations with
9 Mr. Timbers about the neatness of his work?
10   A  No.
11   Q  Why?
12   A  Because I was not the only Foreman on site
13 when Mr. Timbers was there.
14   Q  So do you know if any other Foremen had
15 conversations with Mr. Timbers at this site about
16 the neatness of his work?
17   A  I don't know.
18   Q  You never had a conversation with
19 Mr. Timbers about the neatness of his work at that
20 site?
21   A  No.
22   Q  Did you personally see the work that he

18

1 performed at the site?
2    A  Yes.
3    Q  Did you order the work that he did at the
4 site to be torn down and redone?
5    A  Yes.
6    Q  And you believe you told other masons
7 that?
8    A  Other masons what?
9    Q  To do that work.
10   A  Yes, that's the only way it could get done
11 if I told other masons.
12   Q  I'm saying did you or one of the other
13 masons order the -- did you or one of the other
14 Foremen order the masons to tear down the work?
15   A  At that point in time in which the work
16 was torn down, the other Foreman that was on site
17 when Mr. Timbers was there was no longer at the
18 site.
19   Q  So who ordered the masons to redo Timbers'
20 work?
21   A  I did.
22   Q  We'll come to it later but there's some

19

1 photographs that you provided Tia Taylor at a
2 later point in time.
3       Are you the person who took those
4 photographs?
5    A  Yes.
6    Q  When did you take those photographs?
7    A  It would have been in June of 2019.
8 Between May and June of 2019. In realtime I take
9 photos.
10   Q  What did you do with the photographs of
11 Mr. Timbers' work after you took the photographs?
12   A  They're probably still on the phone.
13   Q  Did you send those to anybody -- at the
14 time in 2019 did you send those to anybody at
15 Telligent?
16   A  No.
17   Q  You just took them and kept them?
18   A  I take photos of all work at all sites at
19 all times.
20   Q  But regularly you don't send that to
21 anybody else at Telligent?
22   A  No, it's always just documented for my

20

1 records so I know of the work.
2    Q  So as we indicated, you didn't have any
3 conversations with Mr. Timbers about the neatness
4 of his work at that site, correct?
5    A  No, I did not.
6    Q  Did you talk with anybody else about the
7 neatness of Mr. Timbers' work at that site?
8    A  Yes.
9    Q  Who did you talk with?
10   A  The other Foreman that was leading the
11 work on that site.
12   Q  And what did you tell him if you can
13 recall?
14   A  I concurred with his observations or I
15 should say his conclusion that the work was not up
16 to par.
17   Q  So is he the one who brought the work to
18 your attention?
19   A  Yes.
20   Q  Did any issues about the -- other than
21 talking to the Foreman did you talk to anybody
22 else about the neatness of Mr. Timbers' work?

**25**

1    A  Yes.
2    Q  And that the overall philosophy if someone
3  is not doing a good job is to train them and
4  continue to try to make them better; is that
5  correct?
6    A  Yes.
7    Q  So is there anything that you're aware of
8  being said to Mr. Timbers about how he should
9  improve?
10      Did you have any conversations with
11 Mr. Timbers about that?
12   A  No.
13   Q  Are you aware if any of the other Foremen
14 at this particular job site had any such
15 discussions with Mr. Timbers?
16   A  I don't recall.
17   Q  Is it usual or unusual for masons to kind
18 of come and go?  They'll be there for a period of
19 time and then they may go off to another job at
20 some other company and then come back at
21 Telligent?
22   A  Yes.

**26**

1    Q  That's not unusual, is it?
2    A  No.
3    Q  If somebody does that and they come back
4  you put them to work, right?
5    A  No, that's up to the office to allow them
6  to be hired again.
7    Q  So you're not involved -- the Foremen are
8  not involved in any of the hiring and firing
9  procedures?
10   A  No, we don't have the final say so.
11   Q  Do you have the ability to terminate a
12 mason?
13   A  No, we don't have the final say so.  A
14 recommendation.
15   Q  In your experience at Telligent for the
16 years you've been there, how many instances are
17 you aware of in which a mason has been terminated?
18   A  A mason probably -- I just didn't see them
19 so I'm not aware specifically which one has been
20 terminated.
21   Q  In other words, there was some masons that
22 were there and then they weren't there?

**27**

1    A  Exactly.
2    Q  But do you recall being told by anyone
3  that a particular mason had been terminated?
4    A  No, because I'm not in H.R.
5    Q  It doesn't matter why.  I'm just saying
6  did anybody ever say to you hey, by the way X has
7  been terminated?
8    A  There would be as far as a companywide
9  e-mail to be sent to all Foremen do not allow this
10 person on site because they have been terminated
11 from the company.
12   Q  And how many times in the time that you've
13 been at Telligent have you gotten that form of
14 e-mail?
15   A  Maybe like three times perhaps.
16   Q  Would one of those be Mr. Timbers?
17   A  Probably so.  I don't recall.  Like I'll
18 look and see okay, this person has been terminated
19 but if they're not on my site I don't move any
20 further as such.
21   Q  Do you have any specific knowledge of
22 any -- any of the people that you got the e-mail

**28**

1  about being terminated where you know the
2  circumstances for the termination?
3    A  No.
4    Q  Let me ask the question this way.
5       You said about three times you've gotten
6  e-mails saying don't use this person if they show
7  up, correct?
8    A  Because they've been terminated.
9    Q  Correct.  So in any of those three
10 instances did you know anything about the
11 circumstances for why the person was being
12 terminated?
13   A  No.
14   Q  Did you ever recommend that anybody be
15 terminated?
16   A  No, I've never had to get to the point
17 where I've had to recommend.
18   Q  I should have asked this at the beginning.
19      Do you have mason experience?
20   A  From a theoretical point of view I do.
21   Q  You never actually worked as a mason?
22   A  In theory.  Only in theory.  Not

**37**

1  Q  But you participated in it?
2  A  Yes.
3  Q  Do you know who else was in that meeting?
4  A  It was -- Kenneth Fisher was there, Jose
5  Valladares, Tranquilino. I think Michael Pappas
6  was there, Chris Pappas.
7  Q  Was Ms. Taylor there?
8  A  I thought there was a gentleman, a
9  Caucasian gentleman that was there. I don't
10 recall Ms. Taylor being there. She might have
11 been there. I remember a Caucasian gentleman
12 being there.
13     MR. TOLAND: Can we go off the record for
14 a second?
15     (Discussion off the record.)
16 BY MR. TOLAND:
17 Q  I just want to make sure. As far as
18 you're aware there was no attorney at that
19 meeting, correct?
20 A  No.
21 Q  You don't know who the Caucasian gentleman
22 was?

**38**

1  A  He was someone -- I just don't know his
2  specific title.
3  Q  Were any other Foremen there?
4  A  Jose Valladares and Kenneth Fisher.
5  Q  And you?
6  A  Yes.
7  Q  Do you know what the purpose of the
8  meeting was? Do you know why the meeting
9  happened?
10 A  I mean I really don't recall. That is the
11 answer. Like I know we were called in and we were
12 discussing a multitude of topics but specifically
13 I don't recall like if there was --
14 Q  This meeting wasn't called just about
15 David Timbers? Was it a meeting and Timbers was
16 one of the things discussed or was it called
17 specifically because of David Timbers?
18 A  I was a general meeting that we were
19 having. Like I don't recall anything beyond that.
20 He did come up in the conversation.
21 Q  The General Superintendent indicated that
22 he has meetings on Tuesdays with the

**39**

1  Superintendents.
2     Was this one of those meetings or was this
3  scheduled for some specific purpose?
4  A  That I don't know if it was scheduled for
5  a specific purpose but it was not a Superintendent
6  meeting because I'm not a Superintendent.
7  Q  You could have been getting a promotion
8  and not know it.
9     Were issues other than David Timbers
10 discussed at this meeting?
11 A  Yes.
12 Q  And how long was this meeting?
13 A  It probably was about an hour because we
14 had --
15 Q  Do you know how much of the meeting
16 involved David Timbers?
17 A  No, he was just one of the topics.
18 Q  Do you know how long the discussion about
19 David Timbers lasted?
20 A  No.
21 Q  At some point someone asked you if you had
22 any information about the quality of Mr. Timbers'

**40**

1  work, correct?
2  A  Do I document all of --
3  Q  At some point someone asked you whether
4  you had any information about the quality of
5  Mr. Timbers' work, correct?
6  A  Specifically like to what?
7  Q  Quality of his work.
8  A  When you say do I have any information
9  what are you specifically asking?
10 Q  Let me back it up this way. At some point
11 as we know it appears to be the --
12 A  On the 19th?
13 Q  From the photographs that you forwarded to
14 Ms. Tia you did that for a reason so what caused
15 you to --
16 A  She asked me for them.
17 Q  And she asked you via this e-mail, not at
18 that meeting?
19 A  Right, via this e-mail.
20 Q  But you had had -- the e-mail suggests
21 that you had some discussion with her that you had
22 photographs so this seems like Ms. Taylor knew

Page 45

1  A  Right.
2  Q  So you would have maybe raised that
3  incident then?
4  A  Yes.
5  Q  But not prior to that time?
6  A  No, because he was not -- he wasn't on
7  my -- I had no responsibility for him.
8  Q  The photographs that you shared in
9  February of 2021 you didn't share with anyone
10 prior to February of 2021, did you?
11 A  No, because I don't forward -- it might
12 have been forwarded to the GC but I take photos of
13 all work on all sites that I do for my record
14 purposes so would have to check and to confer with
15 the general contractor.
16 Q  But you don't recall sending these
17 photographs to anyone at Telligent prior to
18 February of 2021?
19 A  No.
20 Q  Let's go back.  I want to make sure I
21 understand this.
22     This particular work that Timbers did at

Page 46

1  this particular site at that particular time in
2  2019, did you have any conversations prior to this
3  February 2021 meeting with anyone about the
4  quality of his work?
5  A  Yes.
6  Q  So who did you talk to and when?
7  A  The lead Foreman, Kenneth Fisher.
8  Q  At the time?
9  A  Yeah, Kenneth Fisher who was the lead
10 Foreman.
11 Q  Other than that conversation you didn't
12 talk with anybody else at Telligent about it?
13 A  No, because I was not the lead Foreman.
14 Q  Do you know if Kenneth Fisher talked with
15 anybody else about the quality -- any of the
16 Superintendents or anybody at Telligent corporate
17 about David Timbers' work?
18 A  I don't know.
19 Q  Just circle back and we're coming towards
20 the end here.
21     You're not aware of any -- you never heard
22 anything about David Timbers threatening

Page 47

1  Mr. Valladares?
2  A  No.
3     MR. TOLAND:  That's all I have.
4     MR. DeGENNARO:  Do you want to take a
5  little break?
6     THE WITNESS:  No, I'm good.
7     MR. DeGENNARO:  Ms. Glover, do you want to
8  go first and then I'll ask any questions in light
9  of your questions and Mr. Toland's?
10    MS. GLOVER:  That's fine.
11 EXAMINATION BY COUNSEL FOR THE DEFENDANT
12 BY MS. GLOVER:
13 Q  Excuse me, can you pronounce your name for
14 me so I can say it correctly?
15 A  Sure, Nieshia Williams.
16 Q  Ms. Williams, my name is Alana Glover.
17 I'm the attorney today on behalf of Ms. Tia
18 Taylor.  I just had a few follow-up questions for
19 you.
20    First question I have is we briefly
21 discussed the employee handbook.  Do you recall
22 receiving the employee handbook at some point in

Page 48

1  time when you began your employment with
2  Telligent?
3  A  At the start, no, not at the initial start
4  but I do have an employee handbook.
5  Q  Is it your understanding that all
6  employees of Telligent are bound by that handbook?
7  A  Yes.
8  Q  And I just briefly want to talk to you
9  about Tia Taylor.
10    Can you explain to me what you generally
11 know about Tia Taylor if you have ever met her in
12 person before?
13 A  If I can recall, once I was introduced to
14 her I believe she was the head of Human Resources.
15 Q  And around what time were you introduced
16 to Ms. Tia Taylor?
17 A  It would have been -- I believe in 2020 so
18 around August of 2020.
19 Q  Do you recall -- go ahead.
20 A  I believe around August of 2020.
21 Q  And when you initially met her in August
22 of 2020 what was that introduction?  Did you reach

**Page 57**

1  mason -- of course there's different skill levels
2  but there is an expectation that a certain amount
3  of production for whatever is being done -- for
4  example, if it was block, 80-block per day for a
5  mason, 500 brick for a bricklayer, 20 stone for
6  stone but in addition to the production, the
7  quality must be on par so it's that production
8  with quality and the quality includes, you know,
9  plumb, mortar joints, to measurement.
10     Q  And there were occasions when Mr. Timbers'
11 work did not meet that standard of quality?
12     A  Yes.
13     Q  And it would have to be torn down and
14 rebuilt?
15     A  Yes.
16     Q  Was that on more than one occasion?
17     A  When you say "on more than one occasion"
18 what do you mean?  There was more than one
19 location in which he worked?
20     Q  Was it a single instance when his work had
21 to be rebuilt or was it on more than one occasion
22 when he built something it did not meet the

**Page 58**

1  standards and then it had to be torn down and
2  rebuilt?
3     A  For myself just once at that site, that
4  section in which he did.
5     Q  And was he aware of this occurring, that
6  the work had not met the quality standard and it
7  had to be rebuilt?
8     A  I don't know.
9     Q  Circling back to timeliness, one of the
10 other expectation, was timeliness an issue with
11 Mr. Timbers?
12     A  Yes.
13     Q  How so?
14     A  Arriving to work on time and on a
15 consistent basis.
16     Q  And you testified that arriving on a
17 consistent basis and without having -- if you were
18 absent there would be an excuse or a reason for
19 it.
20     If there was not an excuse or a reason for
21 it what would happen?
22     A  If the employee did not --

**Page 59**

1     Q  Consistently failed to show up.
2     A  So there's verbal warnings before there's
3  a formal written warning.
4     Q  And if that employee consistently failed
5  to show up and then they subsequently showed up,
6  would you deny David Timbers work for that reason?
7     A  I would but that would be after going
8  through the proper channels, giving the verbal
9  warning and then giving the written warning then
10 that would be the case.
11     Q  There was prior testimony regarding the
12 use of the word "termination" and whether or not
13 you terminate an employee or a mason.
14     Are there opportunities when you simply
15 decide not to give that mason work at your job
16 site as a Foreman?
17     A  As a Foreman you don't have the authority
18 not to but we can recommend to a Superintendent
19 this has occurred so what would you like to do but
20 that's after.  Like I said, you have a verbal and
21 then you formally write so if the mason was -- I
22 mean when they sign that they've been formally

**Page 60**

1  written up and if they were to show then it's
2  taken up between the Superintendent and Human
3  Resources.  You don't handle what occurs post
4  that.
5     Q  Do you have Exhibit 1 in front of you, the
6  pictures?  Flip through this very briefly but I'm
7  sure you remember it because we talked about it a
8  half an hour ago.
9     Can you describe the quality of the work
10 in that picture?
11     A  What you see here is basically a lot of --
12 the mortar that they use to apply the block, it's
13 all over the brick so one of the -- as a seasoned
14 mason that's something that you wouldn't see is
15 mortar all over the block because therefore that
16 incurs more cost on Telligent because we have to
17 go through and scrape the mortar off because
18 that's -- this isn't a finished product for the
19 general contractor.
20     Q  Would you describe that as poor quality?
21     A  Poor quality.
22     Q  Does that not meet Telligent's

**Page 61**

1 expectations?
2  A  No, it does not.
3  Q  Would that be work that would have to be
4 redone?
5  A  This is scrape work that has to be redone
6 when it's -- no.
7  Q  Would it be corrected at some point?
8  A  Yes.
9  Q  Going back to the incident with the
10 elderly couple showing up at the job site, can you
11 describe that incident?  What happened?
12     MR. TOLAND:  Objection.
13 BY MR. DeGENNARO:
14  Q  You can answer.
15  A  I wasn't there.  It's just that it was
16 brought to my attention later on in the day
17 because again, they got stopped by the security at
18 TSA or the security checkpoint at TSA and it was
19 brought to my attention when I was leaving for the
20 day that an elderly couple showed up looking for a
21 check that David Timbers said that he left for
22 them and because of the fact that it's a secured

**Page 62**

1 site, they had a roster of who has authorization
2 to enter the site so Ms. Ann who was working for
3 the general contractor was able to look up and say
4 he's not even -- he's not at the site so there's
5 nothing here for you and the elderly couple
6 departed.
7     Once I was told of that I was kind of
8 flabbergasted since he did not work there.  His
9 brother actually was working for me at the moment,
10 Anthony Timbers and when I told him of -- that an
11 old couple came looking for his brother he just
12 said oh, he scammed them again.
13  Q  Did Anthony Timbers say anything else
14 beyond that that you recall?
15  A  No.
16     MR. DeGENNARO:  I have no other questions.
17     EXAMINATION BY COUNSEL FOR THE DEFENDANT
18 BY MR. TOLAND:
19  Q  Looking at the -- I do.  Just a couple.
20     Just so we're clear, relative to the work
21 that was done there that brick didn't need to be
22 torn down and redone.  It needed to basically be

**Page 63**

1 chiseled and corrected?
2  A  Yes.
3  Q  And during the time he was there -- you
4 take photographs of lots of stuff, correct?
5  A  Uh-huh.
6  Q  Yes or no?
7  A  Yes, I apologize.
8  Q  You were doing so good.
9     Those are the only photographs you
10 submitted to Telligent about bad work by
11 Mr. Timbers, correct?
12  A  Yes.
13  Q  Presumably if you had more photographs of
14 bad work by him you would have documented it,
15 correct?
16  A  Yes.
17  Q  And this is all that you sent to
18 Ms. Taylor, correct?
19  A  Yes.
20  Q  Did you give any verbal warning to
21 Mr. Timbers about the work he did here?
22  A  No.

**Page 64**

1  Q  Therefore, you didn't do any formal
2 written write-up about the work that he did here?
3  A  No.
4  Q  You mentioned about timeliness on his
5 part.
6     Did you ever give a verbal warning to
7 Mr. Timbers about timeliness?
8  A  No.
9  Q  Did you ever do a formal write-up for
10 Mr. Timbers about timeliness?
11  A  No.
12  Q  Looking at Exhibit 2 if we may and turning
13 to the second page of that, just so we're clear
14 the incident with the older couple that showed up
15 at the NSA job site, correct?
16  A  TSA.
17  Q  I'm sorry, TSA job site, Mr. Timbers was
18 not working at that site for you in January of
19 2020, correct?
20  A  No.
21  Q  And all the information that you received
22 about that incident came from the representative